UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| BRENDA G. SNELL, | : | Case No. 3:12-cv-119 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| COMMISSIONER OF | : | |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

**ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS FOUND NOT
SUPPORTED BY SUBSTANTIAL EVIDENCE, AND IS REVERSED; AND
(2) JUDGMENT BE ENTERED IN FAVOR OF PLAINTIFF
AWARDING BENEFITS**

This is a Social Security disability benefits appeal.  At issue is whether the

administrative law judge ("ALJ") erred in finding the Plaintiff "not disabled" and

therefore unentitled to disability insurance benefits ("DIB") and supplemental security

income ("SSI").  (*See* Administrative Transcript ("Tr.") (Tr. 8-20) (ALJ's decision)).

**I.**

On October 1, 2008, Plaintiff filed applications for DIB and SSI alleging disability

since January 1, 2008.  (Tr. 117-26).  Plaintiff alleges disability due to chronic

lymphocytic leukemia,[1] gastroparesis,[2] depression, and anxiety.  (Tr. 10, 11).  Her

applications were denied initially and upon reconsideration.  (Tr. 52-62, 66-71).

---

[1]  Chronic lymphocytic leukemia ("CLL") is a type of cancer of the blood and bone marrow.  It
typically progresses more slowly than other types of leukemia.  In CLL too many blood stem
cells become abnormal lymphocytes and do not become healthy white blood cells.

A hearing was held before an ALJ on September 29, 2010. (Tr. 28-51). Plaintiff appeared with her attorney and Plaintiff and a vocational expert testified. (Tr. 28-51). The ALJ denied the claim on February 4, 2011, finding that while Plaintiff could not return to her past work, there are a significant number of jobs in the national economy that she could perform. (Tr. 18-19).

Plaintiff requested a review of the ALJ's decision. (Tr. 110-114). The Appeals Council denied review on February 25, 2012. (Tr. 1-4). Plaintiff then commenced this action in federal court pursuant to 42 U.S.C. Section 405(g) for review of the Commissioner's final decision.

At the time of Plaintiff's alleged onset date, she was 49 years old and was considered to be a "younger person" for Social Security purposes. *See* 20 C.F.R. §§ 404.1563(c); 416.963(c). On July 21, 2008, Plaintiff turned 50 and became a person "closely approaching advanced age." *See* 20 C.F.R. § 404.1563(d). Plaintiff has an eleventh grade or limited education. (Tr. 19). Plaintiff's past relevant work included work as a cashier, fast food worker, and a mail clerk. (Tr. 18, 47).

The ALJ's "Findings," which represent the rationale of her decision, were as follows:

1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2013.

2.  The claimant has not engaged in substantial gainful activity since January 1, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

---

[2] Gastroparesis is a condition that reduces the ability of the stomach to empty its contents, but there is no blockage.

3.    The claimant has the following severe impairments: lymphocytic leukemia; gastroparesis; depression; anxiety (20 CFR 404.1520 (c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(d) and 416.967(b) subject to the following limitations: only unskilled work; low stress work (no assembly line production quotas and work that is not fast paced).

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on July 21, 1958 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 10-20).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations, and, therefore, was not entitled to DIB or SSI.  (Tr. 20).

On appeal, Plaintiff argues that: (1) the ALJ erred in determining her RFC[3] because Dr. Wunderlich, the treating specialist, and Dr. Prophater, the treating primary care physician, determined that Plaintiff could not work on a sustained basis in the competitive work environment; and (2) the ALJ erred in her RFC finding because the treating certified psychiatric nurse practitioner found that Plaintiff cannot work on a sustained basis in the competitive work environment.  The Court will address each error in turn.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  In performing this review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled.  As the Sixth Circuit has explained:

---

[3] A claimant's residual functional capacity ("RFC") is an assessment of "the most [she] can still do despite [her] limitations."  20 C.F.R. § 416.945(a)(1).

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, she must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

### A.

The record reflects that:

### *1. Physical Impairments*

Plaintiff's history of intractable GI symptoms started at least by May 2007, when she was treated by primary care physician, Dr. Prophater, for GERD, weight loss, vomiting, abdominal pain, and fatigue,. (Tr. 305-07, 315). At a June 2007 examination, Dr. Prophater noted generalized pain to deep palpation over lower abdominal area and epigastrum.[4] Plaintiff weighed 100 pounds. (Tr. 328).

---

[4]   The epigastrium or epigastric region is the upper central region of the abdomen. It is located between the costal margins and the subcostal plane.

By August 10, 2007, Dr. Prophater noted Plaintiff's abnormal complete blood count ("CBC"), and sent Plaintiff to oncologist/hematologist, Jhansi L. Koduri, M.D., for possible Chronic Lymphocytic Leukemia.  (Tr. 304).  Dr. Koduri initially diagnosed Chronic Lymphocytic Leukemia on August 15, 2007.  (Tr. 218, *see generally*, Tr. 216-25).  Dr. Koduri thought Plaintiff continued to "have nausea and vomiting most likely related to anxiety."[5]  (Tr. 220).

Plaintiff's GI symptoms persisted.  On August 31, 2008, she went to Miami Valley Hospital's ("MVH") ER for epigastric pain with nausea and vomiting, generalized anorexia, and weakness.  (Tr. 227).  Her body mass index ("BMI") was 19.  (Tr. 228).  She was treated for acute gastritis and mild dehydration and released.  (Tr. 227-32).  The next day she woke with "severe nausea," with vomiting, and again went to MVH's ER for treatment.  At discharge, her white cell count was elevated.  (Tr. 237-41).

Plaintiff started to lose weight.  On September 2, 2008, primary care physician Dr. Prophater noted that Plaintiff was 5'2" and 100 pounds.  (Tr. 284).  On September 3, 2008, she was admitted to MVH for five days and treated for "intractable nausea and vomiting."  (Tr. 242-75).  An EGD indicated mild antral

---

[5]  On June 19, 2008, Plaintiff was treated for right knee pain at Miami Valley Hospital's ER. Impression included acute right knee osteoarthritis and Baker cyst.  (Tr. 233-36).

gastritis,[6] gall bladder distension, and a vague liver mass. (Tr. 245). By September 12, 2008, Plaintiff weighed only 89 pounds. (Tr. 298).

On January 15, 2009, Eli Perencevich, D.O., reviewed the medical record for the State agency. (Tr. 356-63). Dr. Perencevich thought Plaintiff should be able to perform light work 6 hours out of an 8-hour day. (Tr. 357). He thought Plaintiff's "stomach problems do not appear physical in nature rather, accompany stress and anxiety."      (Tr. 361). On May 29, 2009, Arthur Sagone, M.D., affirmed Dr. Perencevich's findings. (Tr. 440).

On February 1, 2009, Plaintiff was admitted to MVH for nausea, vomiting and upper abdominal pain. (Tr. 409-35). A CT of her abdomen indicated multiple liver and splenic lesions, as well as a few small lung nodules. (Tr. 433). A bone marrow biopsy was performed and showed "bone marrow involvement by small lymphocytic lymphoma/chronic lymphocytic leukemia; predominantly interstitial pattern; lymphocytes = 10%." (Tr. 409). Dr. Wunderlich, an infectious disease specialist, evaluated Plaintiff's weight loss and potential treatment for Histoplasmosis.[7] Plaintiff weighed 100 pounds and appeared "almost emaciated." Dr. Wunderlich's impressions included "chronic illness with weight loss and

---

[6] Antral gastritis is a digestive condition where an inflammation develops with the antrum or lower part of the stomach.

[7] Histoplasmosis is an infection that occurs from breathing in the spores of the fungus Histoplasma Capsulatum.

cachexia,[8] and anorexia," with associated chronic lymphocytic leukemia, as well as a long history of nausea, vomiting, and upper abdominal pain of unknown cause. (Tr. 431-32).

On February 19, 2009, primary care physician, Dr. Prophater, completed a basic medical form. (Tr. 508-10). Plaintiff was still emaciated at 100 pounds. Plaintiff's conditions included Chronic Lymphocytic Lymphoma, Acute Histoplasmosis, Wasting Syndrome, Gastroparesis, Irritable Bowel, Severe Anxiety, Depression, Agitated Depression, "Reactive Depression" due to "potentially fatal [diagnosis] acute histoplasmosis/small cell lymphoma." (Tr. 508). Plaintiff's prognosis was "poor but stable," and she was unemployable for at least 12 months. (Tr. 508-09).

On February 25, 2009, Plaintiff checked in with Dr. Korubi, about Chronic Leukemia Lymphoma. Plaintiff still felt fatigued. She was stable and did not need to start chemotherapy. However, her liver lesions needed to be monitored with possible chemotherapy. (Tr. 408). Throughout 2009, Dr. Koduri continued to treat/monitor Plaintiff for Chronic Lymphocytic Leukemia, Stage II with mediastinal lymphadenopathy, and histoplasmosis with lung and liver involvement. (Tr. 404-04, 449-50). Immunoglobulin continued to be low. (Tr. 453).

---

[8] Cachexia or wasting syndrome is loss of weight, muscle atrophy, fatigue, weakness, and significant loss of appetite in someone who is not actively trying to lose weight.

A February 27, 2009, CT of Plaintiff's chest revealed left hilar adenopathy[9] and moderate interval decrease in right paratracheal/superior mediastinal adenopathy, right lower lung with 3 mm nodule.  (Tr. 436).  A February 27, 2009, CT of her abdomen and pelvis suggested "some" improvement in the disease process.  (Tr. 437).

Dr. Wunderlich continued to follow Plaintiff for hisoplasmosis after the February 2009 hospitalization.  (Tr. 534-48).  Initially, she improved with treatment and even gained some weight (in April 2009 126 pounds).  (Tr. 546-47). However, on July 7, 2009, Plaintiff reported fever, chills, nausea, decreased appetite, vomiting, depression, and anxiety.  Plaintiff had lost five pounds and weighed 116.5 pounds.  (Tr. 544).  In November 2009, she was doing "fair" with continued nausea, vomiting and abdominal discomfort.  She weighed 113 pounds. (Tr. 541).

On July 10, 2009, Dr. Wunderlich completed a residual functional capacity questionnaire.  (Tr. 444-45, 586).  Dr. Wunderlich limited Plaintiff to performing sedentary work on a part-time basis noting that she would likely need to lie down throughout the work day, and would be absent for at least five days a month.  He stated that Plaintiff was "very weak, fatigues easily, has lymphoma [and] is recovering from Mediastinal Histoplasmosis."  (Tr. 445).

---

[9]  Hilar adenopathy is a radiographic term that describes the enlargement of lymph nodes.

On August 7, 2009, primary care physician, Dr. Prophater, completed a residual functional capacity questionnaire. (Tr. 446-48). Dr. Prophater thought Plaintiff was precluded from performing any work on a sustained basis. (Tr. 446). Plaintiff would likely need to lie down throughout the day, and would be absent for at least five days a month. (Tr. 448).

On September 14, 2009, Plaintiff went to Upper Valley Medical Center's ("UVMC") emergency room with abdominal pain, nausea, and vomiting. (Tr. 470-73). Possible diagnoses included gastroparesis, irritable bowel, appendicitis, and cholecystitis.[10] (Tr. 472). Over the next two weeks, Plaintiff was treated for intractable GI symptoms at UVMC's ER. On examination, Plaintiff was "retching" and spitting up, her abdomen was tender to palpation, and her white blood count was consistently high secondary to chronic lymphocytic leukemia. (Tr. 495-506).

On October 9, 2009, GI specialist, Narayan Peddanna, M.D., evaluated Plaintiff for epigastric pain, nausea, and vomiting. He diagnosed gastroparesis with multiple medical problems. (Tr. 477). EGD and Botox injections (Botox injected into all four quadrant of the pylorus) were performed the next month. (Tr. 474-75).

On December 11, 2009, Dr. Wunderlich ordered a chest CT. The findings were consistent with "granulomatous disease." (Tr. 479-80). Specifically, new

---

[10] Cholecystitis is sudden inflammation of the gall bladder that causes severe abdominal pain.

lesions and nodular-like densities in the right lung were noted as were mild mediastinal and left hilar lymphadenopathies.  (Tr. 480).  Dr. Wunderlich thought it likely Plaintiff had a recurrence of the histoplasmosis.  (Tr. 539-40).  On February 23, 2010, Plaintiff weighed 119 pounds.  (Tr. 537).

In February 2010, Plaintiff was treated at UVMC's ER two times for nausea, vomiting, and abdominal pain.  (Tr. 488-94).  Additionally, she continued to see GI specialist, Dr. Peddanna, for gastroparesis.  (Tr. 562-67).  He suggested repeat EGD and additional Botox injections that were performed in February 2010 and again in September 2010.  (Tr. 562, 568-71).

On March 11, 2010, a chest CT showed an additional "subtle patchy infiltrate" and other findings were "much more conspicuous than the previous study consistent with patient history of histoplasmosis/infection/inflammation in the area."  (Tr. 465).  On a June 30, 2010 chest CT, the right lung looked better, with only mild bronchiectasis left unchanged.  (Tr. 573).

On March 11, 2010, an abdominal and pelvic CT showed some abnormalities of the spleen that could be related to histoplasmosis or nonspecific perfusion; focal subtle fatty liver was also noted.  (Tr. 467-68).

On March 16, 2010, Plaintiff complained of abdominal pain, nausea, vomiting, fatigue, and anxiety.  (Tr. 535).  She was treated for bronchitis and smoking cessation was recommend.  (Tr. 535-36).  The next month she weighed, 115.4 pounds and histoplasmosis appeared inactive.  (Tr. 534).  In July 2010,

because Plaintiff continued to have trouble eating and lost weight as a result (down to 108.6 pounds), an appetite stimulant was prescribed. (Tr. 574).

Dr. Koduri ordered an April 8, 2010, PET CT of Plaintiff's abdomen that showed spleen lesion again or possibly granulomatous. (Tr. 579-80). On April 15, 2010, Dr. Koduri completed a short work questionnaire, and opined, Plaintiff could perform sedentary work on a full-time basis, as well and light and medium work, part-time. (Tr. 549).

### 2. *Psychological Impairments*

Plaintiff also struggled with a long history of depression and anxiety. (Tr. 331). Often, attending and treating sources noted that her psychological symptoms aggravated her GI complaints. For example, in August 2007, oncologist Dr. Koduri noted that Plaintiff continued to "have nausea and vomiting most likely related to anxiety." (Tr. 220). Her primary care physician, Dr. Prophater, treated her for "anxiety, depression, panic disorder" since at least November 2007. (Tr. 301).

In August 2008, the attending physician at MVH noted Plaintiff's flat affect. (Tr. 228). During a September 2008, admission at MVH, Plaintiff was "really depressed, very tearful because of her symptoms." (Tr. 245-46). Another September 2008 examining physician noted that Plaintiff had pressured speech, she was tense, and rocking, and concluded that Plaintiff's abdominal pain may have had a "pscyh. component." (Tr. 297).

On November 10, 2008, Belinda Jean Chaffins, PsyD., a psychologist, examined Plaintiff at the request of the state agency. (Tr. 329-37). Dr. Chaffins noted that Plaintiff had a "long history of depression," and treatment since 1997. (Tr. 331-32). Plaintiff took Xanax for anxiety as prescribed, but was afraid Lexapro would cause "stomach problems and nausea again." (Tr. 332). Plaintiff had anxiety attacks at night where she feels as if she cannot breath, her chest tightens, and she walks around. In fact, Plaintiff "was afraid to lie down to sleep due to fears of having a panic attack." (*Id.*) She felt worthless, helpless, fatigued, and hopeless. Plaintiff was afraid to eat, and had to force herself, as she worried about her GI symptoms.

Clinically, Plaintiff was verbose and hypervigilant. (Tr. 333). Her mood was anxious and depressed, and she cried throughout. She repeatedly cracked her knuckles, and snapped/unsnapped her coat. (*Id.*) Plaintiff's insight and judgment were poor; "her emotions may be worsening her physical symptoms." (Tr. 334).

Dr. Chaffins diagnosed Major Depressive Disorder, a Panic Disorder, and a GAF of 40.[11] Plaintiff was extremely impaired in her ability to withstand the

---

[11] The Global Assessment of Functioning ("GAF") is a numeric scale (0 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults, e.g., how well or adaptively one is meeting various problems-in-living. A score of 31-40 indicates some impairment in reality testing or communication (*e.g.*, speech is at time illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.*, depressed adult avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

stress and pressures associated with regular work activity.  (Tr. 336).  She had a

markedly impaired ability to relate to others.  Dr. Chaffins noted:  Plaintiff "lost

seven jobs in the last five years," and would likely decompensate quickly under

stress and would not be able to function.  (Tr. 336-37).

On November 24, 2008, William Benninger Ph.D., reviewed the

psychological evidence for the state agency.  (Tr. 338-55).  Dr. Benninger opined

that if Plaintiff worked "in an environment free of strict production standards or

fast pace, where simple, repetitive tasks are required and only limited social

contact is necessary, [Plaintiff] would likely perform well."  (Tr. 355).  Kristen

Haskins, Psy.D., affirmed Dr. Benninger's findings on May 27, 2009.  (Tr. 439).

On February 19, 2009, Dr. Prophater's working diagnoses included Severe

Anxiety, and Depression.  Plaintiff was "very anxious" and her speech was

pressured.  (Tr. 508).  Thereafter, Dr. Prophater continued to treat Plaintiff for

anxiety, panic attacks, and depression, until June 2009, when she told him she was

ready to see a psychiatrist.  (Tr. 508-29).

On August 17, 2009, Ms. Budding, certified nurse practitioner ("CNS"),

initially evaluated Plaintiff for depression and anxiety attacks.  (Tr. 558-61).

Plaintiff reported decreased interest, socialization, and house care.  She had

increased fatigue well as a history of suicidal thoughts.  (Tr. 558).  On mental

status examination, Plaintiff's mood was depressed and her affect was sad and

anxious.  (Tr. 560).  Ms. Budding diagnosed Major Depressive Disorder, Anxiety

Disorder, Panic Disorder with Agoraphobia, and GAF of 49.[12] (Tr. 561).

Thereafter, Plaintiff returned for follow-up on average approximately every two

months. (Tr. 551-61, 572).

On every subsequent mental status examination, Plaintiff's mood was

depressed and her affect anxious. (Tr. 551-57, 572). Overtime, Ms. Budding

noted some improvement in Plaintiff's global functioning, with a high of 55,[13] in

October 2010. (Tr. 551-61, 572). At times Plaintiff felt numb with "no reason

to get up." (Tr. 555). In January 2010, Plaintiff was more anxious and stayed

home more as it was a "safe zone." (Tr. 554). Plaintiff was inconsistent with her

suggested medication regime, as she struggled to balance the treatment benefits

with the anxiety about possibly exacerbating her GI symptoms. (*See generally*,

Tr. 551-61).

On January 29, 2010, Ms. Budding completed a mental residual functional

capacity form. (Tr. 441-43). About four months later, supervising psychiatrist,

Jack Lunderman, M.D., reviewed the form and co-signed another copy of the same

form. (Tr. 485-87). The conclusion was that Plaintiff was extremely impaired

in her ability to relate to others at work, relate to the public, and deal with work-

---

[12] A score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe
obsessional rituals, frequent shoplifting) or any serious impairment in social
occupational, or school functioning (*e.g.*, no friends, unable to keep a job).

[13] A score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial
speech; occasional panic attacks) OR moderate difficulty in social, occupational, or
school functioning (*e.g.*, few friends, conflicts with peers or co-workers).

related stress.  (Tr. 442, 486).  Plaintiff's overall progress was "guarded."  (Tr. 443, 487).

Meanwhile, non-psychiatric, attending physicians commented on Plaintiff's mental health.  For example, throughout 2009, treating oncologist/hematologist, Dr. Koduri, regularly listed "generalized anxiety" as one of his working diagnoses. (Tr. 407, 449-50).  In October 2009 and February 2010, attending UVMC's physicians noted Plaintiff was anxious, hyperventilating, uncomfortable, and had a "very dramatic presentation."  (Tr. 492, 497).

## B.

First, Plaintiff alleges that the ALJ's RFC finding is not supported by substantial evidence because Dr. Wunderlich, the treating specialist, and Dr. Prophater, the treating primary care physician, found that Plaintiff could not work on a sustained basis in the competitive work environment.

Dr. Wunderlich and Dr. Prophater both opined that Plaintiff was precluded from performing any work on a full-time sustained basis in the competitive work environment.  (Tr. 445-48, 586).  Both physicians determined that Plaintiff would likely need to lie down throughout the work day, and would be absent at least five days a month.  (Tr. 445, 448).  Treating oncologist/hematologist, Dr. Koduri, thought Plaintiff would at best perform sedentary work.[14]  (Tr. 549).  Despite these

_____

[14]  A claimant will "grid out" as disabled effective at age 50 if her residual functional capacity is limited to only sedentary work.  20 C.F.R. pt. 404, subpt. P, app. 2, § 201.00(g).

findings, the ALJ adopted the opinion of Dr. Perencevich, the non-examining,

reviewing state agency physician, who concluded that Plaintiff could perform light

work.  (Tr. 15).

"In assessing the medical evidence supporting a claim for disability

benefits, the ALJ must adhere to certain standards."  *Blakley v. Comm'r of Soc.*

*Sec.*, 581 F.3d 399, 406 (6th Cir. 2009).

> One such standard, known as the treating physician rule, requires the
> ALJ to generally give greater deference to the opinions of treating
> physicians than to the opinions of non-treating physicians because
> these sources are likely to be the medical professionals most able to
> provide a detailed, longitudinal picture of [the claimant's] medical
> impairment(s) and may bring a unique perspective to the medical
> evidence that cannot be obtained from the objective medical findings
> alone of from reports of individual examinations, such as consultative
> examinations or brief hospitalizations."

*Id.*

"The ALJ 'must' give a treating source opinion controlling weight if the

treating source opinion is 'well supported by medically acceptable clinical and

laboratory diagnostic techniques' and is 'not inconsistent with the other substantial

evidence in [the] case record.'"  *Blakley*, 581 F.3d at 406.  "If the ALJ does not

accord controlling weight to a treating physician, the ALJ must still determine

how much weight is appropriate by considering a number of factors, including the

length of the treatment relationship, supportability of the opinion, consistency of

the opinion with the record as a whole, and any specialization of the treating

physician."  *Id.*

17

Dr. Wunderlich's opinion is supported by multiple diagnostic studies.  Dr. Wunderlich initially saw Plaintiff in February 2009, while she was hospitalized. At that time, an abdominal CT indicated multiple liver and plenic lesions, as well as a few small lung nodules; a bone marrow biopsy was performed and showed "bone marrow involvement by small lymphocytic lymphoma/chronic lymphocytic leukemia; predominantly interstitial pattern." (Tr. 409, 433).  Plaintiff weighed 100 pounds and looked "almost emaciated." (Tr. 431-32).  A February 27, 2009, CT of the chest revealed left hilar adenopathy and moderate interval decrease in right paratracheal/superior mediastinal adenopathy, right lower lung with 3 mm nodule. (Tr. 436).  In April 2009, Plaintiff's weight was up to 126 pounds, and then down to 113 in November 2009.     (Tr. 541, 546-47).  December 2009 and March 2010 CT's were consistent with "granulomatous disease," a patient history of histoplasmosis/infection/inflammation with new lesions, nodular-like densities in the right lung, and mild mediastinal and left hilar lymphadenopathies. (Tr. 465, 479-80).  March 2010 abdominal CT showed some abnormalities of the spleen that could be related to histoplasmosis. (Tr. 467-68).  In July 2010, Plaintiff continued to have trouble eating and lost weight (down to 108.6 pounds). (Tr. 574).

Dr. Prophater's treatment notes indicate that he saw Plaintiff for weight loss, vomiting, abdominal pain, and fatigue, starting in May 2007. (Tr. 305-07, 315).  In June 2007, Dr. Prophater noted generalized pain to deep palpation over

18

lower abdominal area and epigastrum; Plaintiff weighed 100 pounds. (Tr. 328).

In August 2007, after abnormal blood tests, Dr. Prophater referred Plaintiff to Dr.

Koduri for treatment of possible Chronic Lymphocytic Leukemia. (Tr. 304).

Plaintiff required emergency treatment in August and September 2008 for

epigastric pain with nausea and vomiting. (Tr. 227-32, 237-41). Additionally,

Plaintiff was hospitalized for five days in early September 2008. (Tr. 242-75). An

EGD showed antral gastritis, gall bladder, distension, and a vague liver mass. (Tr.

245). By September 12, 2008, Plaintiff weighed only 89 pounds. (Tr. 298). In

September 2009, Plaintiff was treated for intractable GI symptoms at UVMC's ER

in a two week period. Upon examination, Plaintiff was "retching" and spitting up,

her abdomen was tender to palpation, and her white blood count was consistently

high secondary to chronic lymphocytic leukemia. (Tr. 470-73, 495-506). In

February 2010 Plaintiff was treated at UVMC's ER two times for nausea,

vomiting, and abdominal pain. (Tr. 488-94).

Dr. Koduri diagnosed Chronic Lymphocytic Leukemia initially on August

15, 2007. (Tr. 216-25). Dr. Koduri continued to treat/monitor Plaintiff for

Chronic Lymphocytic Leukemia, Stage II with mediastinal lymphadenopathy, and

histoplasmosis with lung and liver involvement. (Tr. 404-04, 449-50). Plaintiff

also saw a GI specialist, Narayan Peddanna, and was treated for gastroparesis with

multiple medical problems. (Tr. 477). Dr. Peddanna ordered EGD, and several

rounds of Botox injections to address Plaintiff's GI symptoms. (Tr. 474-78, 530-33, 562-71).

The treating source opinions are all supported by diagnostic studies. Additionally, all agree Plaintiff is more physically limited than found by the ALJ. A finding that Plaintiff would perform light work activity on a full-time sustained competitive basis is not supported by substantial evidence.

Defendant argues that Plaintiff's primary physical complaints were related to her gastroparesis and, when treated, her symptoms were "controlled." (Doc. 10 at 5-7). However, Defendant's interpretation of the treatment record fails. Plaintiff initially saw a GI specialist, Dr. Peddanna, in October 2009, with complaints of epigastric pain, nausea, and vomiting. Dr. Peddanna diagnosed gastroparesis with multiple medical problems, prescribing Reglan for nausea, and ordering Botox injections. (Tr. 477). Despite the treatment, Plaintiff required emergency room treatment two times in February 2010 for nausea, vomiting, and abdominal pain. (Tr. 488-94). Subsequently, in March and July 2010, Plaintiff continued to have abdominal pain, trouble eating, nausea, and vomiting. As a result, an appetite stimulant was prescribed. (Tr. 574). Accordingly, Plaintiff was not symptom-free as a result of her treatment for gastroparesis.

Defendant attempts to support the ALJ's reliance on Dr. Perencevich's non-examining, reviewing opinion that Plaintiff could perform light work by repeating that because "the treating source opinions were cursory and inconsistent with the

evidence, the ALJ reasonably relied on the opinions of the state agency physicians." (Doc. 10 at 9). However, the Commissioner's regulations establish a hierarchy of acceptable medical source opinions. The hierarchy begins at the top with treating physicians or psychologists, 20 C.F.R. 404.1527(d)(2), § 416.927(d)(2). Next in the hierarchy are examining physicians and psychologists, who often see and examine claimants only once. *See* 20 C.F.R. § 404.1527(d), § 416.927(d). In general, more weight is given to examining medical source opinions than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. § 404.1527(d)(1), 416.927(d)(1). Still, non-examining physicians' opinions are on the lowest rung of the hierarchy of medical source opinions.

> The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker. For example, the opinions of physicians or psychologists who do not have a treatment relationship with the individual are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required to treating sources.

Social Security Ruling 96-6p.

Accordingly, under applicable law, Dr. Perencevich's opinion should have been afforded little, if any, weight. Dr. Perencevich does not have a treatment relationship with Plaintiff; Dr. Perencevich's opinion was based only on the evidence available in January 2009 (much of the medical evidence and treatment post-dates Dr. Perencevich's record review); and unlike Dr. Wunderlich or Dr. Koduyri, Dr. Perencevich is not a specialist.

21

Drs. Wunderlich, Prophater, and Koduri's opinions offer the only examining source opinions. The only contradictory opinion is from Dr. Perencevich, a non-examining reviewing physician. When this is the case, the Sixth Circuit has held that such does not constitute substantial evidence. "The opinion of a nonexamining physician is entitled to little weight if it is contrary to the opinion of the claimant's treating physician." *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

The ALJ's wholesale dismissal of the treating physicians' opinions is the product of a failure to meaningfully apply the treating source rule in the context of the record as a whole. Here, the proof of disability is strong and the opposing evidence is lacking in substance.

## C.

Next, Plaintiff alleges that the ALJ's RFC finding is not supported by substantial evidence because the treating psychiatric certified nurse practitioner, Ms. Budding, found that Plaintiff cannot work on a sustained basis in the competitive work environment.

Ms. Budding opined that Plaintiff was extremely impaired in her ability to relate to others at work, relate to the public, and deal with work-related stress. (Tr. 441-430). Several months later, supervising psychiatrist Jack Lunderman affirmed Ms. Budding's conclusions. (Tr. 485-87). Although Plaintiff never saw Dr. Lunderman, his co-signature on the questionnaire previously completed by Ms.

Budding, indicated that he agreed with her conclusions. Even if the questionnaire were not opinion evidence from an "acceptable" medical source, Social Security has specifically noted that it uses the evidence from other medical sources "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." Social Security Ruling 06-3p (citing 20 C.F.R. § 404.1513(d)). The ruling goes on to note that evidence from these sources is important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

The ALJ made no effort to evaluate Ms. Budding/Dr. Lunderman's opinion under the factors used to evaluate opinion evidence from "acceptable medical sources." SSR 06-3p. Instead, the ALJ adopted the opinion of state agency non-examining reviewing psychologist, Dr. Benninger, finding that Plaintiff could work as long as there were no strict production standards, work was not fast paced, the tasks were simple and repetitive, and social contact was limited. (Tr. 18, 338-55). In rejecting Ms. Budding/Dr. Lunderman's opinion, the ALJ asserted that Plaintiff had "normal mental status at all times." (Tr. 17-18). However, the record shows that at every appointment Plaintiff's mood was depressed and her affect was sad and anxious. (Tr. 551-61, 572).

Next, the ALJ dismissed the opinion of state agency examining consulting psychologist, Dr. Chaffin. Dr. Chaffin thought Plaintiff was extremely impaired in her ability to withstand the stress and pressures associated with regular work

23

activity, and markedly impaired ability to relate to others. (Tr. 336). According to

the ALJ, Dr. Chaffin's findings deserved "little weight" because the "findings

seem to be based solely on the claimant's report and are not supported by

objective findings." (Tr. 18). On clinical examination, Plaintiff was verbose,

hypervigilant, her mood was anxious and depressed, she cried throughout, she

repeatedly cracked her knuckles, repeatedly snapped/unsnapped her coat, and her

insight and judgment were poor. (Tr. 333-34).

        The Sixth Circuit has held:

> when mental illness is the basis of a disability claim, clinical and
> laboratory data may consist of the diagnosis and observations of
> professionals trained in the field of psychopathology. The report of
> a psychiatrist should not be rejected simply because of the relative
> imprecision of the psychiatric methodology or the absence of
> substantial documentation, unless there are other reasons to question
> the diagnostic techniques.

*Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989). Dr. Chaffin and Ms.

Budding's finding on mental status evaluation provided the necessary objective

findings to support their respective opinions. Further, Dr. Chaffin and Ms.

Budding's/Dr. Lunderman's opinions are supported by the remainder of the

record. In 2008, attending physicians at MVH found Plaintiff had a flat affect,

was "really depressed, very tearful because of her symptoms," had pressured

speech, and was tense. (Tr. 228, 245-46, 297). In February 2009, Dr. Prophater

noted Plaintiff was "very anxious" and her speech was pressured. (Tr. 508). In

October 2009 and February 2010, attending physicians remarked Plaintiff was anxious, hyperventilating, uncomfortable, and had a "very dramatic presentation." (Tr. 492, 497).

The ALJ also questioned the severity of Plaintiff's psychological impairment by claiming Plaintiff only had "minimal treatment," seeing Ms. Budding for only 15-20 minutes in monthly sessions and highlighting that Plaintiff is "not seeing a psychologist or psychiatrist." (Tr. 17-18). However, Plaintiff has little, if any, control over how frequently she saw Ms. Budding, the length of appointments, and Ms. Budding's credentials. In fact, the regulations state: "With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as nurse practitioners…have increasingly assumed a greater percentage of the treatment and evaluation functions handled primarily by physicians and psychologists." SSR 06-03p at *3.

Moreover, the record clearly states that Plaintiff had a long history of depression and anxiety. (Tr. 331). Plaintiff's primary care physician treated her for severe anxiety and depression until she was ready to see a psychiatrist in June 2009. (Tr. 508-29). "Appellant may have failed to seek psychiatric treatment for his mental condition, but it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Blankenship*, 874 F.2d at 1124.

Accordingly, the ALJ's failure to appropriately consider the opinions of the nurse practitioner, Ms. Budding, and Dr. Lunderman regarding the severity of Plaintiff's psychological impairments and resulting functional restrictions was error.

## III.

When, as here, the non-disability determination is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 100 (1991).

Generally, benefits may be awarded immediately "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994); *see also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 782 (6th Cir. 1987).

The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is

overwhelming.  *Faucher*, 17 F.3d at 176; *see also Felisky*, 35 F.3d at 1041;

*Mowery v. Heckler*, 772 F.2d 966, 973 (6th Cir. 1985).  Such is the case here.

Here proof of disability <u>is</u> overwhelming and remand will serve no purpose

other than delay.  As fully recited here, in view of the extensive medical record of

evidence of disability, and the credible and controlling findings and opinions of

Drs. Chaffin, Wunderlich, Koduyri, Perencevich, and Nurse Budding, the ALJ

failed to meet its burden of finding substantial evidence that Plaintiff is able to

engage in substantial gainful activity.  Instead, proof of disability is

overwhelming.

## IT IS THEREFORE ORDERED THAT:

The decision of the Commissioner, that Brenda Snell was not entitled to

disability insurance benefits and supplemental security income beginning January

1, 2008 is hereby found to be **NOT SUPPORTED BY SUBSTANTIAL**

**EVIDENCE**, and it is **REVERSED**; and this matter is **REMANDED** to the ALJ

for an immediate award of benefits.  The Clerk shall enter judgment accordingly,

and this case shall be **CLOSED.**


Date:  1/30/13                                             *s/ Timothy S. Black*
                                                                   Timothy S. Black
                                                                   United States District Judge